IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CT-3020-BR

THOMAS SHANE MATHERLY,

    Plaintiff,

v.

DEBORAH A. GONZALES, CANDICE
GREGORY, KENNETH R. MCKOY,
KAREN STEINOUR, J.F. ANDREWS,
and CHARLES SAMUELS,

    Defendants.

ORDER

This matter is before the court on defendants Deborah A. Gonzales, Candice Gregory, Kenneth R. McKoy, Karen Steinour, J.F. Andrews, and Charles Samuels' (collectively "defendants" or "prison officials") motion for summary judgment.[1] (DE # 111.) Plaintiff Thomas Shane Matherly ("Matherly" or "plaintiff") filed a response, (DE # 121), to which defendants replied, (DE # 123). This motion has been fully briefed and is ripe for disposition.

## I. BACKGROUND

Matherly pled guilty to one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(5)(B) and § 2252(b)(2). See United States v. Comstock, 627 F.3d 513, 517 (4th Cir. 2010), cert. denied, 131 S. Ct. 3026 (2011). He received a sentence of forty-one months imprisonment, followed by a three-year term of supervised release. Id. On 22 November 2006, one day before Matherly's projected release date, the United States certified him as a sexually dangerous person under the Adam Walsh Child Protection and Safety Act of 2006 ("Adam

---

[1] All defendants are officials with the Federal Bureau of Prisons or the Federal Correctional Complex in Butner, North Carolina. Matherly has sued all defendants in their official capacities.

Walsh Act"), codified at 18 U.S.C. §§ 4247-4248. Id.; see also United States v. Matherly, No. 5:06-HC-2205-BR (E.D.N.C.), DE # 1. While Matherly was awaiting a civil commitment hearing under the Adam Walsh Act, he initiated the current action on 1 February 2011 pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). (DE # 1, at 1.) On 3 May 2012, Matherly was civilly committed as a sexually dangerous person. See Matherly, No. 5:06-HC-2205-BR, DE # 133. He is currently detained in the Maryland Unit at the Federal Correctional Complex in Butner, North Carolina ("Butner"). (DE # 1, at 4.)[2]

In his complaint, Matherly challenged numerous aspects of his confinement, arguing that they were unconstitutionally punitive under the Fifth Amendment's Due Process Clause. (DE # 1, at 4-12.) By order dated 9 October 2013, the court granted in part and denied in part defendants' motion to dismiss. (DE # 86, at 17-18.) Remaining are Matherly's claims that defendants acted unconstitutionally by 1) subjecting him to "mass shakedowns" and strip searches; 2) providing criminal inmates more access to laundry and recreational facilities than they provide to civil detainees; 3) inspecting all of Matherly's incoming and outgoing mail; and 4) providing criminal inmates more educational and vocational training opportunities than they provide to civil detainees. (Id.) Now, defendants seek summary judgment on all of Matherly's remaining claims. (DE # 120, at 2.)

## II. LEGAL STANDARD

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must ask "'whether reasonable [finders of fact] could find by a preponderance

---

[2] The court will refer to persons civilly committed pursuant to the Adam Walsh Act as "civil detainees" or "Maryland Unit residents."

of the evidence that the plaintiff is entitled to a verdict . . . .'" Maryland Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1252 (4th Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). Summary judgment should be granted only in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." Haavistola v. Cmty. Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The moving party has the burden to show an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The party opposing summary judgment must then demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. Anderson, 477 U.S. at 248. In considering a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the non-moving party and to view the facts in the light most favorable to the non-moving party. Id. at 255.

### III. DISCUSSION

The Fifth Amendment generally prohibits the federal government from subjecting civilly committed persons to punitive confinement conditions. See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."); Bell v. Wolfish, 441 U.S. 520, 535 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). However, the government need not have a "compelling interest" or "substantial necessity" to justify the conditions of confinement of a civil detainee. Youngberg,

3

457 U.S. at 322. As long as a particular condition is "reasonably related to a legitimate governmental objective," it does not constitute "punishment" in the constitutional sense. Bell, 441 U.S. at 539. But if the government fails to establish the required connection between its letgitimate goal and the means used to achieve it, a court may infer an intent to punish. See id. ("[I]f a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment . . . ."); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988) (stating that an intent to punish may be inferred if the challenged condition of confinement is "not reasonably related to a legitimate nonpunitive governmental objective"). A civil detainee may also establish a Fifth Amendment violation by proving that the government "imposed [the condition] with an expressed intent to punish . . . ." Martin, 849 F.2d at 870.

When examining the conditions of a civil detainee's confinement, the court must afford substantial deference to the professional judgment of prison administrators. See Youngberg, 457 U.S. at 321 (approving the standard that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." (internal quotation omitted)); Bell, 441 U.S. at 547 ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve [order and security]."). Further, "placement in a prison, subject to the institution's usual rules of conduct" does not alone amount to punishment of a civil detainee. Allison v. Snyder, 332 F.3d 1076, 1079 (7th Cir. 2003) (citing Bell, 441 U.S. 520); see also Ballard v. Johns, 17 F. Supp. 3d 511, 518 (E.D.N.C. 2014)

("[P]lacement of civil detainees in a prison, subject to the institution's usual rules of conduct does not in and of itself equate to punishment of civil detainees and civil detainees are subject to the same security policies as those used at correctional facilities."). The court additionally recognizes that institutional safety and successful treatment of civil detainees are legitimate governmental interests. See Thornburgh v. Abbott, 490 U.S. 401, 415 (1989) (identifying prison security as a legitimate governmental interest that is "central to all other corrections goals") (internal quotation omitted); Lamonda v. Johns, No. 5:10-CT-3221-D, 2011 WL 2036647, at *2 (E.D.N.C. May 24, 2011) (recognizing prisoner rehabilitation as a legitimate governmental objective).

With these considerations in mind, the court will address each of Matherly's claims in turn.

**A. Strip searches and mass shakedowns**

Matherly contends that prison officials often subject him to strip searches and conduct unannounced searches of his cell ("shakedowns") with an express intent to punish him. (Pl.'s Resp., DE # 121, at 3.) He also argues that they search his cell "with the main purpose of seeking information to be used as evidence against [him]." (Id.) Matherly testified that prison officials "conduct strip searches of [civil detainees] as punishment. These searches are conducted often when a [civil] detainee complains about their [sic] living conditions or speaks out against staff. They are also conducted to intimidate and humiliate [civil] detainees." (Compl., DE # 1, at 10 ¶ 16B.)[3] Matherly states that prison officials have subjected him to such searches after he objected to prison staff identifying him as an "inmate." (Id.)

---

[3] Plaintiff's complaint is verified. Therefore, it may be considered in resolving defendants' motion for summary judgment. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (citations omitted)).

5

Matherly has failed to produce sufficient evidence to allow a reasonable fact-finder to determine that defendants conducted strip searches or shakedowns as retribution, rather than for defendants' stated purpose of maintaining institutional security, (Def.'s Mem., DE # 120, at 11-12 (citing BOP Dep., DE # 120-1, at 153-54, 155, 157, 164-66)). He has not provided dates, times, or other specific details of searches, nor has he provided any testimony of other civil detainees who defendants allegedly subjected to retaliatory searches. Without more, his claim that searches are "often" conducted after he voices a complaint is insufficient to create a triable issue of fact. Additionally, Matherly's claim that prison officials searched his cell in order to obtain evidence against him fails for the same reasons.

Matherly also argues that the strip searches and mass shakedowns are not reasonably related to the government's legitimate safety concerns, and, thus, a reasonable fact-finder could infer that such practices are punitive. (Pl.'s Resp., DE # 121, at 16.) He argues that the testimony of Lt. Hilda Candelario ("Lt. Candelario"), a lieutenant with the Bureau of Prisons ("BOP") employed at Butner, shows that defendants lack formal policies guiding the implementation of search procedures.[4] (Id. at 12-17.) Matherly contends that BOP's "informal" guidelines result in the "unfettered discretion" of the captain and shift lieutenant. (Id. at 12-14.) These "overly broad and unorganized" procedures, he argues, have no reasonable relation to defendants' alleged safety objectives. (Id. at 16.)

Regarding mass shakedowns, Lt. Candelario testified that every area of Butner gets searched "within a certain amount of time." (BOP Dep., DE # 120-1, at 155:21-24.) Addressing the random nature of the searches, she noted that if the searches were to follow a certain pattern, longtime inmates would be able to anticipate the searches. (Id. at 156:15-19.) Lt. Candelario also stated that shakedowns may be conducted at the direction of the captain or in response to

---

[4] Lt. Candelario provided deposition testimony for the BOP pursuant to Federal Rule of Civil Procedure 30(b)(6).

6

receiving "intelligence." (Id. at 155:24-156:3; 157:6-16.) With regard to strip searches, Lt. Candelario testified that civil detainees and criminal inmates are subject to the practice on an equal basis. (Id. at 154:11-18.) She stated that "[t]here are certain policies in place" that require all detainees to be strip searched: 1) after meeting with any visitor; 2) when returning to Butner after being outside the facility; 3) when "suspected of carrying contraband[;]" and 4) after returning from "an administrative or detention issue" in the Maryland Annex or from "special housing[.]" (Id. at 153:22-155:8.)

Defendants maintain that the underlying purpose of all searches is to promote the safety of inmates and prison staff. (Def.'s Mem., DE # 120, at 11-12 (citing BOP Dep., DE # 120-1, at 153-54, 155, 157, 164-66).) They argue that strip searches and shakedowns are applied equally to civil detainees and criminal prisoners because, in their experience, "the same types of contraband, assaults and violent behavior that occur within the [criminal] population[] have also been found to occur in the [civil] detainee population . . . ," (Def.'s Mem., DE # 120, at 11 (citing BOP Dep., DE # 120-1, at 164-66)).

The court concludes that no reasonable finder of fact could determine that the defendants' use of strip searches and shakedowns amounts to unconstitutional punishment.[5] These practices are reasonably related to the government's legitimate interest in maintaining institutional security. Matherly is subject to the same search policies as criminal inmates because prison officials have found that civil detainees pose similar security threats. In light of this, the court cannot conclude that such practices are overly broad, arbitrary, or irrational. While formal, written policies regarding searches would certainly bolster defendants' position, the lack of such policies does not alone permit the inference that the searches are punitive. Further, this

---

[5] To the extent Matherly bases his objection to the searches on the Fourth Amendment, his claim will be dismissed. See Bell, 441 U.S. at 557-58 (holding that the searches of pretrial detainees' rooms as well as body cavity searches were not unreasonable within the meaning of the Fourth Amendment).

7

conclusion affords the appropriate deference to prison administrators tasked with maintaining institutional order and safety.

B. **Access to laundry and recreational facilities**

Matherly argues that his limited access to Butner's recreational and laundry facilities constitutes unconstitutional punishment. (Pl.'s Resp., DE # 121, at 18-19.) Butner has two recreation yards: the main yard, which is accessible at different times to both criminal inmates and civil detainees, and the Maryland Unit yard ("Maryland yard"), which is accessible only to the civil detainees in that unit. (McCulloch Report, DE # 120-2, at 7.) Matherly testified that criminal inmates have greater access to the main yard, which is larger and contains more equipment than the Maryland yard. (Compl., DE # 1, at 6 ¶ 5.) He stated that the Maryland yard "is only open when an officer is available to supervise" and that "[i]t is never open on Tuesday." (Id.) Further, he testified that the Maryland yard contains nothing more than "some benches[,] a horseshoe pit, and beach volleyball court." (Id.) Matherly's retained expert, Deborah McCulloch ("McCulloch"), described the Maryland yard as "relatively large . . . with equipment to engage in exercise and leisure activities outdoors." (McCulloch Report, DE # 120-2, at 7.) She reported the only significant difference between the two yards was that the main yard contained weight-lifting equipment, which the Maryland yard lacked. (Id.)

There is a slight discrepancy between the parties' assertions regarding the amount of time that civil detainees have access to the main yard. Matherly states they have daily access between 10:30 a.m. and 12:00 p.m. as well as Tuesday evenings.[6] (Compl., DE # 1, at 6 ¶ 5.) Lt. Candelario testified that civil detainees have access to the main yard on Mondays, Tuesdays, Thursdays, and Fridays from 10:30 a.m. to 11:45 a.m.; on Wednesdays for the majority of the day; and on Saturdays and Sundays from 6:30 a.m. to 9:30 a.m. (BOP Dep., DE # 120-1, at

---

[6] Matherly is not clear as to whether "daily" means five or seven days a week.

160:17-161:1.) In addition, she stated that they have access to the Maryland yard from 2:00 p.m. to 8:30 p.m., with only a break for "count" at 3:45 p.m.[7] (Id. at 161:2-7.) Matherly testified that criminal inmates have access to the main yard five days a week from 6:30 a.m. to 10:30 a.m. (Compl., DE # 1, at 6 ¶ 5.)

Defendants argue that "the choice to limit [civil detainees'] access to the institution's main recreation yard is a decision born out of concern for safety." (Def.'s Mem., DE # 120, at 7.) Dr. Karen Steinour ("Dr. Steinour"), the Commitment and Treatment Program Administrator at Butner, testified that keeping the Maryland Unit residents separate from criminal inmates serves an important security interest becuase "[s]ex offenders are typically not the most welcomed population within a prison setting." (BOP Dep., DE # 120-1, at 51:18-20.)[8]

The court concludes that no reasonable finder of fact could determine that defendants' decision to limit Matherly's access to the main recreation yard is unconstitutionally punitive. Rather, it is rationally related to the legitimate purpose of protecting the safety of civil detainees and maintaining institutional order. Further, any disparity in civil detainees' and criminal inmates' respective access to the main recreation yard is mitigated by the access civil detainees have to the Maryland yard. The de minimis differences in the two yards do not permit a reasonable fact-finder to infer that civil detainees' access to recreational facilities amounts to unconstitutional punishment.

Matherly's claim regarding his limited access to Butner's laundry facilities is similarly untenable. Butner has two laundry facilities. The main facility is located in an area close to where the criminal population is housed, (BOP Dep., DE # 120-1, at 135:11-18), and both criminal inmates and civil detainees have access to it at different times, (id. at 162:7-19). In

---

[7] Lt. Candelario is not clear as to what days of the week civil detainees have access to the Maryland yard.
[8] Dr. Steinour also provided deposition testimony for the BOP pursuant to Federal Rule of Civil Procedure 30(b)(6).

9

order for Maryland Unit residents to access that facility, they must pass through an area where criminal inmates are located. (Id. at 135:14-18.) Accordingly, prison staff must secure that area to keep criminal inmates out when Maryland Unit residents access it. (Id. at 162:9-14.)

Prison staff provides laundry services at the main facility, and, thus, detainees drop off dirty laundry and return at a later time to pick up their laundered items. (Id. at 54:4-15.) Maryland Unit residents have access to the main facility only on Wednesdays "for a certain specified number of hours," while criminal inmates have access the other days of the week.[9] (Id. at 53:16-23.) Unlike the criminal inmates, the civil detainees must wait an entire week before returning to receive their clean clothes. (Id. at 54:16-20.) However, they are given replacement clothing sufficient to last the intervening week. (Id. at 55:4-8.)

The second laundry facility is located within the Maryland Unit and consists of at least one washing machine. (See Compl., DE # 1, at 6 ¶ 6 (Matherly stating that only one washing machine is available); BOP Dep., DE # 120-1, at 162:2-3 (Lt. Candelario testifying that "they also have two washers and two dryers on the [Maryland] unit.").) Unlike the main laundry facility, the Maryland Unit facility requires civil detainees to launder their own clothing. (Id. at 54:2-3.) It is unclear how much access Maryland Unit residents have to the unit's own facility. Matherly describes his access as "limited," (DE # 121, at 18), while defendants contend that the facility is available "daily," (DE # 120, at 9).

Matherly argues that civil detainees' comparative lack of access to the main laundry facility evinces the punitive nature of his confinement. (Pl.'s Resp., DE # 121, at 19.) Defendants contest the assertion that civil detainees have less access to the main laundry facility than criminal inmates, stating that "all individuals housed at Butner have designated laundry

---

[9] Criminal inmates, however, do not have unfettered access to the main laundry facility on these days. (BOP Dep., DE # 120-1, at 162:17-23 ([I]t's not like anytime [criminal inmates] want to show up at laundry they can show up. There's still a timeframe.").)

10

days." (Def.'s Mem., DE # 120, at 8.)  Further, they argue the security concerns attendant to the civil detainees' use of the main laundry facility justify any disparity.  (Id.)

The court concludes that no reasonable finder of fact could infer that the purpose of limiting Matherly's access to the main laundry facility is to inflict punishment.  Any disparity between civil detainees' and criminal inmates' access to the facility is rationally related to Butner's interest in maintaining security.  The prison must undertake additional security measures when allowing civil detainees to access the main laundry facility.  Limiting the security risk of having civil detainees in areas of Butner where criminal inmates are housed is a legitimate governmental interest, and allowing civil detainees access to the main laundry facility only once a week constitutes a reasonable means to promote such interest.  Further, any disparity is assuaged by the fact that Butner provides civil detainees with weekly clothing that "far exceeds the [amount of] clothing issued to [criminal] inmates," (McCulloch Report, DE # 120-2, at 8), and with facilities where they can launder their own clothing.

In sum, there is no genuine dispute of material fact that defendants' practice of limiting Matherly's access to the main recreational and laundry facilities is consistent with the requirements of the Fifth Amendment.

**C. Mail inspection**

Matherly objects to prison officials' practice of opening and inspecting all of his incoming and outgoing mail.  (Pl.'s Resp., DE # 121, at 19-24.)  Civilly committed individuals have protected First Amendment rights in both sending and receiving mail.  See Hudson v. Palmer, 468 U.S. 517, 547 (1984).  However, "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment . . . ."  Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977).

11

Restrictions on an adjudicated civil detainee's constitutional rights are valid "if [they are] reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987).

Dr. Steinour has "some input" with regard to the mail policies for Maryland Unit residents. (Id. at 5:14-15; 71:23-72:2.) She testified that it is Butner's policy to review all of the unit's incoming and outgoing mail, except legal mail. (Id. at 73:16-17; 78:5-12.) Dr. Steinour stated that, to her knowledge, there is no written policy regarding these practices and procedures. (Id. at 74:10-11.) Norma Baskerville ("Baskerville"), a secretary at Butner, is tasked with reviewing all Maryland Unit mail. (Id. at 73:19-24.) If Baskerville flags mail as potentially harmful, Dr. Steinour then reviews the content and "make[s] the recommendation" as to whether or not the mail will be delivered. (Id. at 88:22-89:9.) While various Butner employees have received training on what types of mail are subject to rejection, Baskerville has not received such training, although Dr. Steinour has communicated with her directly regarding mail restrictions. (Id. at 78:23-79:24; 82:10-83:9.)

Dr. Steinour testified that Butner's mail inspection practices resulted from a need to promote the goals of the sex offender treatment program and "to protect individuals [outside of Butner]." (BOP Dep., DE # 120-1, at 77:3-10; 86:3-10; 91:2-5.) She further stated that prior to implementing the policy of reviewing all of Maryland Unit residents' mail, Butner employed random screenings. (Id. at 89:22-90:7.) While that policy was in place, Butner staff discovered that "individuals were potentially about to be victimized" and that residents "were writing about hurting kids," which prompted "a more conservative approach." (Id.)

Matherly contends that, as a result of the lack of formal written policies, Butner's mail inspection practices are so arbitrary and subjective that they cannot be reasonably related to a legitimate governmental interest. (Pl.'s Resp., DE # 121, at 24.) McCulloch, Matherly's expert,

12

opined that "there must be a written framework of policy and guidelines on which to make decisions." (McCulloch Report, DE # 120-2, at 12.) Matherly further argues that "negative inferences" can be drawn from defendants' "refusal to address potential [less-restrictive] alternatives . . . ." (Pl.'s Resp., DE # 121, at 21.) Specifically, he points to defendants' failure to respond to his suggestion that he be permitted to open mail in the presence of a Butner official. (Id. at 20-21.)

Courts apply four factors, which the Supreme Court articulated in Turner, to determine the reasonableness of the government's restriction of a detainee's First Amendment rights:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

Beard v. Banks, 548 U.S. 521, 529 (2006) (quotations and citations omitted) (alteration in original); see also Rivera v. Rogers, 224 F. App'x 148, 151 (3d. Cir. 2007) (unpublished); Cooke v. United States Bureau of Prisons, 926 F. Supp. 2d 720, 736 (E.D.N.C. 2013) (applying the Turner factors to a civil detainee's constitutional claims). The Supreme Court elaborated that "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the [plaintiff's] constitutional complaint." Turner, 482 U.S. at 90-91.

Consideration of the Turner factors leads the court to conclude that Butner's mail inspection practices are reasonably related to a legitimate penological interest. "Courts have repeatedly upheld institutional rules concerning restrictions on mail . . . for civil detainees." English v. Johns, No. 5:11-CT-3026-D, 2014 WL 555661, at *8 (E.D.N.C. Feb. 11, 2014), aff'd, 582 F. App'x 229 (4th Cir. 2014) (unpublished). As stated above, defendants indisputably have

13

a legitimate interest in maintaining the safety of its facility and promoting rehabilitation of civil detainees. The court additionally finds that ensuring that detainees do not abuse individuals outside of the facility is a legitimate governmental interest. Inspecting all Maryland Unit residents' mail, save for legal mail, is rationally related to serving such interests. While written guidelines regarding such procedures are certainly preferable, the court cannot conclude that the lack of such formal policies renders Butner's mail inspection practices arbitrary or irrational. This is especially so considering Butner's prior experience with the less-restrictive, random-screening policy. While the prison employed the more permissive policy, Butner staff discovered letters which described victimization of children. Butner's "need to protect individuals" from abuse was one factor which gave rise to the current policy. (BOP Dep., DE # 120-1, at 91:2-7.) "That [plaintiff] would prefer a different policy concerning the monitoring of his mail does not render the challenged policy constitutionally infirm." English, 2014 WL 555661, at *8. Accordingly, the court finds that there is no dispute of material fact that defendants' mail inspection practices are reasonably related to the legitimate governmental interests of ensuring the safety of individuals inside and outside of Butner, as well as promoting effective rehabilitation of civil detainees.[10]

### D. Access to vocational training and educational opportunities

Matherly argues that prison officials provide vocational and educational programs to criminal detainees on a more favorable basis than to civil detainees. (Pl.'s Resp., DE # 121, at 24-28.) He stated that criminal inmates have access to opportunities including "[b]lue-print reading, introduction to towing, keyboarding, electrical education, carpentry, Mineke Car Care Program, GED, and more[,]" none of which are available to him. (Compl., DE # 1, at 6 ¶ 3.)

---

[10] Analysis under the Fifth Amendment produces the same result. Because the court has found that the mail inspection practices are rationally related to a legitimate governmental interest, no reasonable finder of fact could infer that such policies amount to unconstitutional punishment.

Matherly does not claim that he has an underlying constitutional right to such opportunities. Rather, he maintains that the unequal access to vocational training and educational opportunities amounts to punishment in violation of the Fifth Amendment. Defendants, on the other hand, contend that "limits placed on the educational and vocational opportunities afforded to Plaintiff are reasonably related to legitimate treatment and institutional security objectives." (Def.'s Mem., DE # 120, at 10-11.)

Maryland Unit residents have access to Butner's main educational facility once each week "for a couple [of] hours" during which time they may participate in electronic educational courses. (BOP Dep., DE # 120-1, at 57:14-17; 60:19-61:7.) Dr. Steinour stated that there "may be" additional educational programs available to civil detainees within the Maryland Unit. (Id. at 62:9-10.) There was a plan to allow Maryland Unit residents to access electronic educational materials on the unit's own computer system, but Dr. Steinour testified that she did not know whether those materials were made available. (Id. at 59:21-60:13.) Those educational resources are available in the main educational facility accessible to other inmates. (Id. at 60:14-18.) Dr. Steinour stated that she "[did not] know it to be the case" that Maryland Unit residents have less access than criminal inmates to educational programs. (Id. at 63:21-54:5.) However, she did testify that certain restricitons are placed on computers located in the Maryland Unit as a result of civil detainees' past abuse of computer privileges. (Id. at 136:7-137:10.) Prison officials discovered that some civil detainees who enrolled in classes used their access to word processing programs to write graphic stories describing abuse of children, and then subsequently distributed those stories to other Maryland Unit detainees. (Id. at 136:16-23.) Regarding vocational training, McCulloch confirmed Matherly's assertion that "the vocational opportunities relative to

15

the trades is [sic] not an option offered to those who are civilly committed." (McCulloch Report, DE # 120-2, at 9.)

The court finds that there exists a genuine dispute of material fact as to whether defendants' limitations on Matherly's access to educational and vocation programs are reasonably related to treatment and security interests. Defendants have a legitimate interest in encouraging effective treatment and promoting institutional order by deterring civil detainees from writing and distributing stories depicting abuse of children. However, there remains a triable issue as to whether the limitations imposed on Matherly's access to educational and vocational opportunities are reasonably calcuated to deter abusive computer practices. Defendants do not dispute Matherly's contention that he has no access to the vocational training programs provided to criminal inmates, and they provide no explanation as to how such broad restrictions are reasonably related to legitimate governmental interests. Further, there are unresolved questions of fact regarding the extent of Matherly's access to educational opportunities. Dr. Steinour was unable to state the extent of the disparity between civil detainees' and criminal inmates' access to such programs. Thus, the court is unable to determine whether the limitations that defendants impose on civil detainees' access to educational programs are reasonably related to treatment and security interests. A reasonable finder of fact could infer that defendants' wholesale denial of vocational training to Matherly, combined with the limitations on his educational opportunities, constitutes punishment.

Matherly urges this court to grant summary judgment in his favor pursuant to Federal Rule of Civil Procedure 56(f). (Pl.'s Resp., DE # 121, at 30.) Having determined that unresolved factual issues remain, the court declines that invitation.

16

Case 5:11-ct-03020-BR    Document 124    Filed 05/18/15    Page 16 of 17

## IV. CONCLUSION

Based on the foregoing, defendants' motion for summary judgment, (DE # 111), is GRANTED IN PART and DENIED IN PART. The motion is denied as to Matherly's claims regarding educational and vocational opportunities. The remainder of his claims are DISMISSED.

This 18 May 2015.

_____

W. Earl Britt

Senior U.S. District Judge