IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CT-3020-BR

THOMAS SHANE MATHERLY,              )
                                    )
            Plaintiff,              )
                                    )
v.                                  )    MEMORANDUM IN SUPPORT
                                    )    OF DEFENDANTS' MOTION
DEBORAH A. GONZALES, CANDICE        )    FOR SUMMARY JUDGMENT
GREGORY, KENNETH R. MCKOY,          )
KAREN STEINOUR, CHARLES SAMUELS     )
and J.F. ANDREWS,                   )
                                    )
            Defendants.             )
                                    )

      Defendants, by and through the United States Attorney for

the Eastern District of North Carolina, hereby file this

Memorandum in Support of Defendants' Second Motion for Summary

Judgment.

      Plaintiff filed this action pursuant to <u>Bivens v. Six

Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403

U.S. 388 (1971), asking for both monetary and equitable relief.

In his Complaint, Plaintiff, who has been committed pursuant to

the Adam Walsh Child Protection and Safety Act of 2006 ("Adam

Walsh Act"), and is housed as an inmate at the Federal

Correctional Institution ("FCI") in Butner, North Carolina,

alleges that his constitutional rights were violated by

Defendants, when they treated plaintiff punitively through

various conditions of his confinement. By way of written order [DE #86] dated October 9, 2013, this Court partially granted Defendants' motion to dismiss [DE #69], and left viable only Plaintiff's claims regarding disparities in recreation time, access to laundry facilities, and access to vocational and education opportunities; and the claims regarding strip searches, mass shakedowns and the treatment of incoming and outgoing mail.

By way of a subsequent written order [DE #124] dated May 18, 2015, this Court partially granted Defendants' motion for summary judgment [DE #111] with respect to all remaining claims except Plaintiff's claim regarding disparate access to vocational and educational opportunities. In its discussion, the Court noted that Defendants were "unable to state the extent of the disparity between civil detainees' and criminal inmates' access to such programs, which precluded the Court from determining whether limitations imposed were "rationally related to treatment and security interests." Defendants seek to file this second motion for summary judgment in order to develop and present facts responsive to the open questions and evidentiary gaps identified in this Court's prior order.

## I.  Summary Judgment Evidentiary Standard.

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. <u>Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact-finder to return a verdict for that party. <u>Anderson</u>, 477 U.S. at 250.

## II.  Defendants' Statement of Undisputed Material Facts.

Plaintiff's Complaint alleges that criminal inmates have access to educational and vocational training opportunities, including "[b]lue-print reading, introduction to towing, keyboarding, electrical education, carpentry, Mineke [sic] Car Care Program, GED, and more," "<u>NONE</u>" of which are available to him. (Compl., p.6 ¶ 3.) Plaintiff does not contend that he has an underlying constitutional right to such opportunities, but

3

instead maintains that unequal access to vocational and educational training is punitive and therefore violates the Fifth Amendment.

As an initial matter, several of the bare allegations contained in Plaintiff's complaint are not substantiated by the actual undisputed facts of record. See Anderson, 477 U.S. at 256 (noting that a party resisting summary judgment "may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial"). For instance, the Meineke Car Care program referenced in Plaintiff's complaint was discontinued (due to budgetary constraints) in 2007 with respect to all inmates at FCC Butner. (Neagle Decl. ¶ 32.)

Similarly, Plaintiff's allegation that civil detainees have no access to GED education is simply inaccurate: While it is true that no GED classes are currently offered to the CTP population at this time, this is because there is no identified need for such.[1] (Id. ¶ 27.) However, at least one civil detainee previously expressed an interest in obtaining his GED, and in that case a self-study plan was put in place whereby Defendants provided the detainee with access to the necessary

_____

[1] Indeed, Plaintiff's academic transcript shows that he already possesses a GED or High School diploma and therefore has no need for GED classes himself. (Neagle Decl., Attach. 2.)

4

instruction and tutors. (Id. ¶ 28.) Likewise, Plaintiff's allegation that civil detainees are denied the opportunity to participate in Narcotics and Alcoholics Anonymous is also false; in fact, 5-7 civil detainees are presently participating in such programming, which the institution arranges through an outside sponsor. (Denson Decl. ¶¶ 3, 5.)

Finally, Plaintiff's allegation that he is unable to obtain instruction in keyboarding is belied by his Education Data Transcript, which indicates that Plaintiff actually completed a 10-hour class in keyboarding earlier this year. (Neagle Decl. ¶ 39 & Attach. 2.) In addition, Plaintiff has participated in and completed both Adult Continuing Education ("ACE") and community college courses in a variety of subjects (including investing and personal finance, diversity and communication, and health and wellness) while being certified or committed at FCI Butner. (Id.)

Going beyond the specific allegations of Plaintiff's complaint, the evidence in this case will show that the educational and vocational programming sponsored by the Education Department at FCI Butner consists of the library, OASIS courses, Adult Continuing Education courses, GED, postsecondary education, and vocational training. The evidence will further show that many of these opportunities are available

both to general population inmates and civil detainees, and that where disparities exist, there are legitimate nonpunitive governmental reasons supporting them.

## A. Leisure/Law Library Access and OASIS Courses.

All inmates at FCI Butner[2] are provided access to library resources, to include fiction and non-fiction books, movies, and other reference materials. (Neagle Decl. ¶ 8.) Books and educational materials beyond what are maintained in the FCI Butner library inventory may be obtained by both general population inmates and civil detainees through an inter-library loan program. (Id. ¶ 10.) The main institution library, located within the Education Department, also contains computer terminals providing inmate access to an Electronic Law Library ("ELL"), as well as a classroom containing additional computer terminals providing inmate access to "OASIS" computer-based courses. (Neagle Decl. ¶¶ 11-13, 21.) The OASIS course offerings include approximately 200 self-study courses on a wide variety of topics, including both academic (e.g., computer and

---

[2] All references to "FCI Butner" herein are a reference to the single instutition comprised of the Clemson, Duke, Georgia Tech, Maryland, North Carolina, State, Virginia and Wake Forest housing units. The occasional reference to "FCC Butner" is a reference to the entire Federal Correctional Complex comprised of the Federal Medical Center ("FMC"), Low Security Correctional Institution ("LSCI"), FCI, FCI-II and Satellite Prison Camp. For purposes of this case, the sentenced inmates housed specifically at FCI Butner are considered to be the relevant comparator population, since educational and vocational programming offered by the BOP will frequently vary between different institutions.

6

literacy) and vocational (e.g., green building and HVAC) subjects. (Neagle Decl. ¶ 21 & Attach. 1.)

General population inmates at FCI Butner only have access to the main institution library. There are approximately 660 general population inmates currently housed at FCI Butner, and the library is open to this population six days per week for a total of 49 hours per week. (Neagle Decl. ¶ 6; Ratledge Decl. ¶ 9.) By contrast, there are approximately 60 civil detainees currently housed at FCI Butner, and the main institution library is open to this population for two hours each Wednesday. (Neagle Decl. ¶ 7; Ratledge Decl. ¶ 10.) While at first blush this may seem like a significant disparity, it must be noted that the time allocation is roughly proportional to the ratio of general population inmates to civil detainees housed at the institution.[3]

Beyond this, however, FCI Butner has established a satellite library inside the Maryland Unit for use solely by civil detainees.[4] (Neagle Decl. ¶ 9.) Civil detainees have access to this satellite library seven days per week for a total of 87.5 hours per week. (Id.; Ratledge Decl. ¶ 10.) Thus,

---

[3] Solving for the ratio $60/660 = x/49$, $x = 4.5$ hours per week, which would represent perfectly proportional library access based on population.

[4] Furthermore, civil detainees are the only population at FCI Butner who are provided their own satellite library. (Ratledge Decl. ¶ 10.)

civil detainees actually have nearly twice as much library access as general population inmates, despite the fact that general population inmates outnumber civil detainees by a factor of ten.

The Maryland Unit satellite library provides all the same resources as the main institution library, including additional ELL computer terminals, with the exception of OASIS computers. (Neagle Decl. ¶¶ 14, 23.) Thus, civil detainees currently wishing to complete an OASIS course must do so during the two hours per week that the main institution library is accessible to them. However, since inmates register for OASIS courses on their own, and proceed through the courses at their own pace (Neagle Decl. ¶ 22), the more limited time that the main library is open to civil detainees does not present a *per se* barrier to civil detainees completing those courses. Furthermore, the Education Department is currently exploring the possibility of locating additional OASIS computer terminals in the Maryland Unit satellite library (exclusively for use by civil detainees) if that can feasibly be done without compromising the safety and security of the institution. (Neagle Decl. ¶ 23.)

**B.   Adult Continuing Education ("ACE").**

The Education Department also sponsors a variety of Adult Continuing Education ("ACE") courses, which are classes that are

proposed, planned, and taught (in a live classroom setting) by inmates themselves. (Neagle Decl. ¶¶ 15-16.) The subject matter of ACE courses offered at any given time may vary, as the ability to offer these classes depends on the availability of inmates with the particular subject-matter expertise and willingness to teach the course. (Id. ¶ 16.) Thus, the ACE courses offered to general population inmates and civil detainees also varies, since the two populations are kept separate from each other to the extent practicable. (Id. ¶ 17; Ratledge Decl. ¶ 7.) At the present time, the following ACE courses are offered to the general population: Money Smart, Pre/Lit Writing, Math Refresher, Commodities, Commercial Driver's License ("CDL"), and Introduction to Business/Landscaping; and the following ACE courses are offered to civil detainees: Career Motivation, Basic Writing Skills, and Business Management I and II. (Neagle Decl. ¶¶ 19-20.)

**C.    General    Education    Development    ("GED")    and Postsecondary Education.**

As discussed above, GED classes are available both to general population inmates as well as any civil detainee who expresses an interest. (Neagle Decl. ¶¶ 26-28.) Furthermore, all inmates at Butner are permitted to take post-secondary

9

education courses[5] by correspondence in accordance with BOP Program Statement 5354.03, _Postsecondary Education Programs for Inmates_, with approval from the Education Department. (_Id._ ¶ 24-25.) However, these courses are not sponsored by the BOP and inmates are responsible for researching these opportunities and paying for all associated costs (tuition, books, etc.) themselves. (_Id._ ¶ 25.)

**D. Vocational Programs.**

The vocational programming offered at FCI Butner consists of computer-based OASIS courses (discussed above, which are available to civil detainees) and hands-on, instructor-led courses for which inmates may be eligible to receive Continuing Education credit and/or certificates. (Neagle Decl. ¶¶ 29-31.) FCC Butner contracts with Vance-Granville Community College to provide the hands-on vocational training to inmates. (_Id._ ¶ 33.) At the present time, four vocational courses are being offered to general population inmates at FCI Butner: electrical, logistics, parenting, and horticulture. (_Id._ ¶ 35.) Generally speaking, these vocational courses are offered on a schedule of approximately four days per week, for approximately one to two

---

[5]  Post-secondary education courses are defined by BOP Program Statement 5354.03, _Postsecondary Education Programs for Inmates_, as courses for college credit other than courses which pertain to the BOP's occupational or vocational education programs, which are discussed below. _See_ Federal Bureau of Prisons public website at http://www.bop.gov/policy/progstat/5354_003.pdf, for the complete Program Statement.

hours per day, for a total of roughly 115-120 hours of instruction. (Id. ¶ 34.) Given the substantial classroom time required for these types of classes, combined with the costs of providing the courses separately to the civil detainee population[6] and the limited number of anticipated participants from among that population, vocational instruction is only available to general population inmates at this time. (Id. ¶¶ 34, 37.) Previously, the BOP offered the horticulture course to civil detainees through the use of a greenhouse that was constructed for the exclusive use of the CTP, but that course was terminated in 2014 in large part because the time commitment required by the course interfered with detainees' participation in treatment. (Id. ¶ 36; Hernandez Decl. ¶ 12.) However, BOP is currently reviewing the possibility of restarting the horticulture course for civil detainees, as well as offering other educational and vocational opportunities to the CTP population to the extent that there is sufficient interest and it can be accomplished without interfering with sex offender treatment. (Neagle Decl. ¶¶ 36-37.)

    E.    **Sex Offender Treatment.**

    Although it may beg the obvious, civil detainees are provided one primary educational resource (albeit not one under

---

[6] Vocational programming costs the BOP approximately $3,000 to $5,000 per course, per session. (Neagle Decl. ¶ 33.)

the purview of the Education Department) that is entirely unavailable to the general population – the Commitment and Treatment Program ("CTP") itself.[7]  And the CTP curriculum includes more than just sex-offender specific psychotherapy: it is a comprehensive and multidimensional program that seeks to increase a participant's psychological, sexual, physical, relational, social and spiritual well-being.  (Hernandez Decl. ¶ 5.)  Thus, the CTP offers many non-sex offender specific groups and educational activities, such as the assertiveness/communication skills, financial management, and art projects classes that are included in the current schedule of group activities for CTP participants.  (Hernandez Decl. ¶¶ 5, 10 & Attach. 2.)  Nonetheless, the primary purpose of a civil detainee's commitment is to receive sex offender treatment to assist the individual in becoming no longer sexually dangerous.  (Id. ¶ 8.)  To this end, although the amount of time spent in treatment varies according to each civil detainee's individual treatment needs, as a general estimate a civil detainee would need to spend approximately 30 hours per week in individual, group, and milieu therapeutic activities in order to

---

[7] Plaintiff has consistently refused to participate in the CTP (Hernandez Decl. ¶ 13), but Plaintiff's personal decision not to avail himself of the variety of activities offered through that program does not establish that he has fewer opportunities for educational enrichment and personal development than sentenced inmates.

obtain the intended therapeutic benefit of the program. (Id.
¶ 9.)

**III. Discussion.**

The Due Process Clause of the Fifth Amendment prohibits the
government from subjecting civilly committed persons to punitive
conditions of confinement. See Youngberg v. Romeo, 457 U.S. 307
(1982). Generally speaking, involuntarily committed persons
"are entitled to more considerate treatment and conditions of
confinement than criminals whose conditions of confinement are
designed to punish," but this standard is not intended to "place
an undue burden on the administration of institutions." Id. at
322. Thus, the government need not have a "compelling" interest
or even demonstrate a "substantial" necessity to justify the
conditions of confinement of a civil detainee. Id.

Rather, to establish that a particular condition of his
confinement is constitutionally impermissible "punishment,"
Plaintiff has the burden of showing either that it was (1)
imposed with an expressed intent to punish or (2) not reasonably
related to a legitimate nonpunitive governmental objective, in
which case an intent to punish may be inferred. Martin v.
Gentile, 849 F.2d 863, 870 (4th Cir. 1988); see also Bell v.
Wolfish, 441 U.S. 520, 539 (1979) ("[I]f a particular condition
or restriction of ... detention is reasonably related to a

13

legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment...."). In applying this standard, court should afford substantial deference to the professional judgment of prison administrators. See Youngberg, 457 U.S. at 321; Bell, 441 U.S. at 547.

Plaintiff cannot meet this burden given the undisputed facts of record. The rational basis for Plaintiff's conditions of confinement begins with the intent of Congress as expressed in statute. Congress has specifically mandated that criminal sentences be fashioned with the objective (among others) of "provid[ing] the defendant with needed educational or vocational training," 18 U.S.C. § 3553(a)(2)(D), whereas Congress has mandated that those who have been civilly committed be placed in a suitable facility specifically for "treatment" of their serious mental disorder, id. § 4248(d). In Youngberg, the Supreme Court held that all due process requires is that the government provide civilly committed persons with "minimally adequate or reasonable training," 457 U.S. at 319, and the BOP has met this burden through the implementation of the CTP itself which (in Defendants' exercise of professional judgment) is

14

designed to provide all the therapy and relapse prevention tools that civil detainees need to treat the sexual disorders for which they have been committed so as to allow them to be safely reintegrated back into the community. (<u>See</u> Hernandez Decl. ¶ 5.)

Furthermore, while the <u>Youngberg</u> Court did hold that civil detainees were generally entitled to "more considerate treatment" than criminal inmates, 457 U.S. at 322, Defendants question whether the educational and vocational opportunities offered to general population inmates could ever be an appropriate yardstick against which to measure the constitutional adequacy of the programming offered to civil detainees. This is because the full, unabridged quotation from <u>Youngberg</u> suggests only that a civil detainee's conditions of confinement should be more considerate than those of "criminals whose conditions of confinement <u>are designed to punish</u>." 457 U.S. at 322 (emphasis added). However, providing "needed educational or vocational training" to sentenced inmates is not a retributive goal of incarceration but a rehabilitative one; it is not a condition of confinement that is "designed to punish," but rather a condition that is designed to help an individual who may have resorted to a life of crime due to a lack of opportunity and give him such tools as may be necessary to

15

become a gainfully employed and productive member of society upon release.

Analogously, the CTP is designed to treat the sexual disorders for which Plaintiff (and others) have been civilly committed and provide them the tools to safely reintegrate into society, although the specific developmental targets and rehabilitative methods may very well differ in both form and kind from those that would help rehabilitate a typical street criminal from an underprivileged background. The fact that there is not perfect parity between programming available to sentenced inmates and civil detainees simply does not support any inference whatsoever of intent to punish. BOP has satisfied its constitutional obligations so long as the programming it does offer to civil detainees through the CTP is "minimally adequate" and "reasonable in light of identifiable liberty interests," Youngberg, 457 U.S. at 319 & n.25, with due deference given to the professional judgment of the treatment professionals in charge of implementing the program. And it is manifestly reasonable for BOP to make sex offender treatment a programmatic priority for civil detainees even if that limits the amount of time detainees have to pursue other developmental opportunities or the resources that the BOP has to offer detainees in terms of extra-curricular educational or vocational

16

training, since sex offender treatment is the very reason for their commitment. (Hernandez Decl. ¶¶ 8, 11.)

Even if the Court remains unconvinced by this analysis, however, the undisputed facts demonstrate very minimal disparity between the educational opportunities available to general population inmates and those available to civil detainees. As discussed above, inmates and detainees both have opportunities to obtain their GED through FCI Butner's Education Department, and to pursue postsecondary education on their own. Both inmates and detainees have access to take any of the nearly 200 computer-based, self-study OASIS courses, which includes offerings on a variety of educational and vocational topics.[8] And both inmates and detainees are offered Adult Continuing Education ("ACE") courses through FCI Butner's Education Department. Although the specific course offerings at any given time may differ between inmates and detainees, this is merely a

---

[8] At present, OASIS courses are only accessible on dedicated computers in the main institution's Education Department, and civil detainees only have access to the institution library for two hours per week each Wednesday. Thus, while civil detainees have equal access to OASIS, it is not for an equal amount of time (it is, however, a roughly proportional amount of time given the ratio of inmates to detainees). However, keeping civil detainees separate from inmates has been determined to be in the interest of safety, security, and orderly operation of the institution, and so civil detainees cannot be granted access to the main education department at the same times as sentenced inmates. (Neagle Decl. ¶ 4; Ratledge Decl. ¶ 7.) Instead, BOP chose to allow civil detainees access to the institution's Education Department for two hours on Wednesdays (the only weekday that no group therapy is scheduled for the CTP, see Hernandez Decl., Attach. 2) and establish a satellite library within the Maryland Unit for the exclusive use of civil detainees. (Neagle Decl. ¶¶ 7, 9.)

function of the fact that ACE courses are taught by inmates themselves (who have some background expertise in the subject matter), and thus the menu of course offerings varies between populations depending on whether there is a qualified instructor in a given population who is willing to lead a class. (Neagle Decl. ¶¶ 16-17.) In the same fashion, therefore, ACE course offerings will vary between general populations at different institutions, so there is no reasonable inference that any disparities in course offerings are evidence of unconstitutional punishment directed to civil detainees.

The only real disparity that exists, therefore, is with respect to the vocational courses taught by contract instructors from Vance-Granville Community College. Put simply, these are time-intensive courses (with classes meeting for approximately two hours per day, four days per week, and requiring approximately 115-120 total hours of instruction) that are difficult to reconcile with the even more intensive time commitment (of approximately 30 hours per week) required for full participation in the CTP. (Neagle Decl. ¶ 34; Hernandez Decl. ¶ 9.) Although the BOP constructed a greenhouse in the Maryland Unit for use solely by civil detainees and even offered a horticulture course to civil detainees for several years, this course was eventually cancelled due to its interference with the

treatment schedule, and instead the CTP administration repurposed the greenhouse to be used for CTP community service and work project therapeutic milieu activities. (Neagle Decl. ¶ 36; Hernandez Decl. ¶ 12.)

Furthermore, any vocational training that would be provided to civil detainees would have to be scheduled (and paid for) separately from the classes that are already being provided to general population inmates. This is because civil detainees are kept separate from sentenced inmates to the maximum extent possible in order to maintain the safety, security and orderly operation of the institution.[9] (Ratledge Decl. ¶ 7.) However, the costs of providing a vocational course (contracted through the local community college), combined with the relatively small population of the Maryland Unit (60 detainees) and correspondingly low anticipated interest in such courses, would generally make it cost-prohibitive to provide a comprehensive offering of vocational classes for civil detainees.[10] (Neagle

---

[9] Indeed, many civil detainees (including Plaintiff in this very Bivens case) have complained about having even incidental contact with sentenced inmates, claiming that this puts them at risk of harassment and/or assault. (See, e.g., Compl. p.8, ¶ 12.) Plaintiff cannot have it both ways; given his agreement with BOP policy that civil detainees and inmates be kept separate to the extent possible, he cannot then fault BOP for not opening enrollment in the vocational courses now being offered to the general population to him.

[10] As the Youngberg Court recognized, fiscal and budgetary constraints should be considered as a legitimate reason supporting any disparities in educational or vocational programming. See 457 U.S. at 321, 323; see also Thomas S. v. Morrow, 781 F.2d 367 (4th Cir. 1986) ("[Q]ualified professionals, to whom the courts owe deference, may consider the burden on

Decl. ¶¶ 33, 37.) Nevertheless, the BOP is currently reviewing the possibility of restarting the horticulture program for civil detainees and continues to explore and consider ways in which to provide additional vocational opportunities beyond that.[11] (Neagle Decl. ¶ 37.)

Finally, as discussed above, civil detainees are in many respects given greater access to educational opportunities than sentenced inmates: the CTP itself offers a full schedule of programming (both sex-offender specific therapy and more general activities geared to personal development), and the Maryland Unit is the only housing unit in FCI Butner that has its own satellite library dedicated for the exclusive use of civil detainees. Nothing in the <u>Youngberg</u> decision suggests that there must be perfect parity in programming as between inmates

---

the state when they prescribe treatment."); <u>Jackson by Jackson v. Fort Stanton Hosp.</u>, 964 F.2d 980, 992 (10th Cir. 1992) ("In <u>Youngberg</u>, the Court concluded that 'the State is under a duty to provide respondent with such training as an appropriate professional would consider <u>reasonable</u>....' A reasonable consideration must necessarily incorporate a cost analysis.") (citation omitted).

[11] The Court may also take note that Plaintiff appears never to have filed an administrative remedy requesting that any particular vocational class be made available to him. (Coll Decl., Attach. 1.) Although Defendants recognize that exhaustion of administrative remedies is not a jurisdictional prerequisite to suit (as it is for sentenced inmates), it is nonetheless relevant that Plaintiff has not availed himself of the opportunity to have the Education Department consider any specific requests for vocational training he would like to propose, given that both the Clinical Coordinator of the CTP and the Supervisor of Education indicate they are open to offering vocational classes to the CTP population provided there is sufficient interest to make providing the class worthwhile and it can be scheduled so as not to conflict with treatment activities. (Neagle Decl. ¶ 37; Hernandez Decl. ¶ 11.)

and detainees, and looking to the totality of the circumstances, civil detainees are provided "more considerate treatment" overall than their sentenced counterparts.

## IV. Conclusion.

For all of the reasons discussed, Defendants respectfully request that the Court grant summary judgment in favor of Defendants as to Plaintiff's sole remaining educational and vocational training opportunity claim.

Respectfully submitted, this 28th day of August, 2015.

THOMAS G. WALKER
United States Attorney


BY: /s/ Matthew L. Fesak
MATTHEW L. FESAK
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 27601-1461
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
Email: matthew.fesak@usdoj.gov
N.C. Bar No. 35276
Attorney for Defendants

21

CERTIFICATE OF SERVICE

I do hereby certify that I have this 28th day of August 2015, served a copy of the foregoing upon the below-listed parties by electronically filing the foregoing with the Court on this date using the CM/ECF system.

A. Lee Hogewood, III
N.C. State Bar No. 17451
K&L Gates LLP
P.O. Box 17047 (27619-7047)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Email: lee.hogewood@klgates.com

John H. Culver, III
N.C. State Bar No. 17849
K&L Gates LLP
Hearst Tower, 47th Floor
214 North Tryon Street
Charlotte, NC  28202
Email: john.culver@klgates.com

/s/ Matthew L.FESAK
MATTHEW L. FESAK
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 27601-1461
Telephone:  (919) 856-4530
Facsimile:  (919) 856-4821
Email: matthew.fesak@usdoj.gov
N.C. Bar No. 35276
Attorney for Defendants